1
2
3
4

Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

5

*Counsel for Plaintiff*

6

7
8

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

9
10
11

EDUARDO CORREA, derivatively on
behalf of GENIUS BRANDS
INTERNATIONAL, INC.

Case No.:

12

Plaintiff,

13

v.

DEMAND FOR JURY TRIAL

14
15
16
17

ANDY HEYWARD, ROBERT L.
DENTON, JOSEPH "GRAY" DAVIS, P.
CLARK HALLREN, MICHAEL
KLEIN, MARGARET LOESCH,
LYNNE SEGALL, and ANTHONY D.
THOMOPOULOS,

18

Defendants,

19

20

and

21
22

GENIUS BRANDS INTERNATIONAL,
INC.,

23

Nominal Defendant.

24

25

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

26
27
28

**INTRODUCTION**

Plaintiff Eduardo Correa ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Genius Brands International, Inc. ("Genius" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Andy Heyward ("Heyward"), Robert L. Denton ("Denton"), Joseph "Gray" Davis ("Davis"), P. Clark Hallren ("Hallren"), Michael Klein ("Klein"), Margaret Loesch ("Loesch"), Lynne Segall ("Segall") and Anthony D. Thomopoulos ("Thomopoulos") (collectively, the "Individual Defendants," and together with Genius, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Genius, unjust enrichment, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Genius, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Genius's directors and officers from March 17, 2020 through the July 5, 2020, both dates inclusive (the "Relevant Period").

2.      Genius is a California-based content and brand management company that creates and licenses multimedia content for toddlers and tweens. Specifically, and relevantly, Genius recently launched (1) "Rainbow Rangers," an animated children's television program; (2) "Kartoon Channel!" a wholly-owned media distribution outlet; and (3) the "Stan Lee Universe," a joint venture that owns and is attempting to utilize the unreleased intellectual property—works created after his Marvel era—of the late comic book writer, Stan Lee.

3.      Immediately prior to the Relevant Period, the price of the Company's stock consistently traded at less than $1.00 per share and, as a result, Genius was in danger of being delisted from the NASDAQ.

4.      According to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), Genius incurred an operating loss each fiscal quarter since its inception, due to its struggle to create reliable and significant revenue streams, and more recently resulting from skyrocketing costs and expenses. The Company's 2019 10-K also indicated that the Company would not be able to continue operations but for securing additional financing.

5.      Beginning on March 13, 2020, and continuing throughout the Relevant Period, by way of repeated materially false and misleading statements and omissions, Defendant Heyward and the Individual Defendants aggressively hyped Genius's products, including Rainbow Rangers, the Kartoon Channel!, and the Stan Lee Universe, and, in turn, heavily marketed Genius's stock to retail "Robinhood investors,"[1] by way of predatory promotional tactics, to induce investors into artificially pumping up the value of the Company's share price.

---

[1] *See* Will Ebiefung, *3 Robinhood Stocks That Might Not Exist in 5 Years*, THE MOTLEY FOOL (July 30, 2020, 6:08 AM), https://www.fool.com/investing/2020/07/30/3-robinhood-stocks-that-might-not-exist-in-5-years.aspx; Dilantha De Silva, *The Rise of Robinhood Traders And Its Implications*, SEEKING ALPHA (June 19, 2020, 11:09 AM), https://seekingalpha.com/article/4354679-rise-of-robinhood-traders-and-implications (explaining Robinhood investors as a new "group of amateur traders" utilizing the zero-commission trading app Robinhood).

6.      For example, on March 17, 2020, the Company issued a press release titled "Nickelodeon Expands Daily Broadcasts of Genius Brand International's Hit Preschool Series, Rainbow Rangers" (the "March 17 Rainbow Press Release") announcing that Nickelodeon had increased the broadcast of Rainbow Rangers to 26 airings per week. However, as pointed out in the report published by Hindenburg Research on June 5, 2020 entitled "A Bagholder's Guide to Why We Think Genius Brands Will Be a $1.50 Stock Within a Month" (the "Hindenburg Report")[1] and admitted to by Defendant Heyward in a Blog Post on June 18, 2020, Nickelodeon was broadcasting Rainbow Readers only *nine* times per week, and at unfavorable time slots.

7.      Moreover, on May 13, 2020 and June 12, 2020, the Company issued press releases declaring its new Kartoon Channel! the new "Netflix for kids, but free" and described it as "fully ad-supported" and an "economic vaccine for COVID-19." The Company unequivocally affirmed "[t]here is no subscription fee." However, upon launch on June 15, 2020, it was revealed that Kartoon Channel! was available to Amazon Prime members only as an add-on channel for an additional subscription fee.

8.      The Individual Defendants' vulturine tactics largely succeeded. After trading at well below $1 per share for nearly a year, the Company's shares began skyrocketing. On June 3, 2020, Genius stock reached a closing high of $7.93 per share, and during trading on June 4, 2020 hit an intra-day high of $11.73 per share. In fact, from March 16, 2020 to June 3, 2020, Genius's stock price shot up more than 5000%.

9.      Meanwhile, Genius conducted five separate direct offerings of shares to certain "long standing investors" through which Genius sold more than 50 million shares at below-market valuations while raising millions of dollars in liquid capital.[2]

---

[1] https://hindenburgresearch.com/genius-bagholder-guide/ (last visited August 28, 2020).
[2] *See* Rich Duprey, *Why Genius Brands Is Still Falling Today*, THE MOTLEY FOOL (June 30, 2020, 12:57 PM), https://www.fool.com/investing/2020/06/30/why-genius-brands-is-still-falling-today.aspx (explaining that Genius's management has "engaged in dilutive stock practices that allowed its new investors who injected cash into [the Company] to immediately profit at the expense of existing shareholders").

10. Thereafter, on or about June 11, 2020, Genius announced "selling shareholders" would resell approximately 60 million shares to the market while Genius's stock remained trading at over 2000% more than it was going for only three months prior.

11. On June 19, 2020, only 11 days after Defendant Heyward assured investors that he had not "sold a single share" of Genius stock, Defendant Heyward sold 460,574 shares of Company stock at $2.94 per share, for gross proceeds in the amount of approximately $1.3 million—while the valuation of the Company's stock was still approximately 1300% more than it had been in March,

12. In June and July 2020, as the truth of Defendant Heyward's and the Individual Defendants' exaggerated and hollow statements regarding the Company's products, valuation and growth potential slowly emerged, as unveiled in, among other things, the Hindenburg Report, the Company's SEC filings, and the Company's press releases and investor conference calls, Genius's share price began to drop rapidly. For example, on June 3, 2020, Genius's stock closed at $7.93 per share before closing at $3.97, representing a sharp decrease of nearly 50%, only four trading days later.

13. Defendant Heyward and the Individual Defendants continued to drum up unwarranted valuations of Genius through embellished and hyperbolic publicizing of the Company's outlook, including current commercial prospects and future growth potential. The Company announced via press release on July 2, 2020 that it would be hosting a conference call with investors to announce an "exciting" and "key" business development on July 6, 2020.

14. However, on July 6, 2020, the truth was finally revealed to the investing public. Genius's purportedly important announcement fell flat on its face as investors quickly realized that the Company, in fact, did not have a significant update. Rather, Genius merely announced a joint venture regarding Stan Lee, with whom it had previously announced a collaboration with many months prior. This was simply more of the same.

15.     On this news, the price of the Company's stock plummeted from $3.55 per share at the close of trading on July 2, 2020, to an intra-day low of $2.58 per share, representing a drop in value of more than 27%, before closing at $2.66 per share at the end of trading on July 6 2020, representing a drop in value of more than 25% on a massive trading volume of approximately 170 million shares.[3]

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Genius's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (2) Kartoon Channel! would be available to Amazon Prime members only as an add-on channel for an additional subscription fee; (3) Kartoon Channel! platform was not as robust of an offering as the Individual Defendants purported; (4) the commercial viability of the Company was overstated in light of the true accuracy of the Company's products and assets; and (5) the Company failed to maintain internal controls. Due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

17.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

---

[3] For example, approximately 17,607,500 shares of the Company's stock were traded just two business day prior, on July 1, 2020.

19.     Furthermore, during the Relevant Period, Defendant Heyward breached his fiduciary duties by making a lucrative insider sale, obtaining proceeds of over $1.3 million.

20.     In light of the Individual Defendants' misconduct, which has subjected Genius and its Chairman and Chief Executive Officer ("CEO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses due to the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Genius's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

### JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims also raise a federal question pertaining to the claims based on violations of the Exchange Act made in the Securities Class Action.

Verified Shareholder Derivative Complaint

24.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

29.     Venue is proper in this District because Genius and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

30.     Plaintiff is a current shareholder of Genius common stock. Plaintiff has continuously held Genius common stock at all relevant times. Plaintiff is a citizen of Puerto Rico.

### Nominal Defendant Genius

31.     Genius is a Nevada corporation with its principal executive offices located at 1900 North Canon Drive, Floor 4, Beverly Hills, California 90210. Genius's shares trade on NASDAQ under the ticker symbol "GNUS."

**Defendant Heyward**

32.  Defendant Heyward is the founder of Genius and has served as the Company's Chairman and CEO since 2013. According to the Company's Schedule 14A filed on April 14, 2020 (the "2020 Proxy Statement"), as of March 30, 2020, Defendant Heyward beneficially owned 3,019,949 shares of the Company's common stock, which represented 9.99% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 30, 2020 was $0.28, Defendant Heyward owned approximately $845,586 worth of Genius stock.

33.  For the fiscal year ended December 31, 2019, Defendant Heyward received $967,994 in compensation from the Company. This included $411,500 in salary, $287,500 in option awards, and $124,000 all other compensation.

34.  During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Heyward made the following sale of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 06/19/2020 | 460,574 | $2.94 | $1,354,087 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

35.  The Company's 2020 Proxy Statement stated the following about Defendant Heyward:

*Andy Heyward, 71,* has been the Company's Chief Executive Officer since November 2013 and the Company's Chairman of the Board since December 2013. Mr. Heyward co-founded DIC Animation City in 1983 and served as its Chief Executive Officer until its sale in 1993 to Capital Cities/ ABC, Inc. which was eventually bought by The Walt Disney Company in 1995. Mr. Heyward ran the company while it was owned by The Walt Disney Company until 2000 when Mr. Heyward purchased

DIC Entertainment L.P. and DIC Productions L.P, corporate successors to the DIC Animation City business, with the assistance of Bain Capital and served as the Chairman and Chief Executive Officer of their acquiring company DIC Entertainment Corporation, until he took the company public on the AIM. He sold the company in 2008. Mr. Heyward co-founded A Squared Entertainment LLC in 2009 and has served as its Co-President since inception. Mr. Heyward earned a Bachelor of Arts degree in Philosophy from UCLA and is a member of the Producers Guild of America, the National Academy of Television Arts and the Paley Center (formerly the Museum of Television and Radio). Mr. Heyward gave the Commencement address in 2011 for the UCLA College of Humanities and was awarded the 2002 UCLA Alumni Association's Professional Achievement Award. He has received multiple Emmys and other awards for Children's Entertainment. He serves on the Board of Directors of the Cedars Sinai Medical Center. Mr. Heyward has produced over 5,000 half hour episodes of award winning entertainment, among them *Inspector Gadget*; *The Real Ghostbusters*; *Strawberry Shortcake*; *Care Bears*; *Alvin and the Chipmunks*; *Hello Kitty's Furry Tale Theater; The Super Mario Brothers Super Show; The Adventures of Sonic the Hedgehog*; *Sabrina The Animated Series*; *Captain Planet and the Planeteers*; *Liberty's Kids*, and many others. Mr. Heyward was chosen as a director because of his extensive experience in children's entertainment and as co-founder of A Squared Entertainment.

36.    Upon information and belief, Defendant Heyward is a citizen of California.

**Defendant Denton**

37.    Defendant Denton has served as Genius's Chief Financial Officer ("CFO") since April 2018. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Denton beneficially owned 71,726 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2020 was $0.28, Defendant Denton owned approximately $20,083 worth of Genius stock.

38.    For the fiscal year ended December 31, 2019, Defendant Denton received $262,439 in compensation from the Company. This included $215,625 in salary, $25,000 in bonus, and $21,814 in option awards.

Verified Shareholder Derivative Complaint

39.     The Company's 2020 Proxy Statement stated the following about Defendant Denton:

> *Robert Denton, 60*, has been our Chief Financial Officer since April 18, 2018. He served as the Chief Financial Officer of Atlys, Inc. a next-gen media technology company from 2011 to 2018. He has over 30 years of experience as a financial executive, specifically in the entertainment industry. He began his career in 1982 with Ernst & Young handling filings with the Securities and Exchange Commission, including initial public offerings. He left Ernst & Young in 1990 to work as Vice President and Chief Accounting Officer for LIVE Entertainment, Inc. In 1996, LIVE was acquired by Artisan Entertainment, Inc., and, in December 2000, Mr. Denton was promoted to Executive Vice President of Finance and CAO. Mr. Denton also served as the COO of Artisan Home Entertainment, where he directed all financial reporting, budgeting and forecasting, manufacturing and distribution of the Home Entertainment Division. Mr. Denton left Artisan at the end of 2003 and joined DIC Entertainment Corporation to serve as their Chief Financial Officer. At DIC, he directed the three-year financial audit, due diligence and preparation of the company's Admission Documents, and he was responsible for all monthly financial reporting to the Board of Directors as well as the semi-annual reporting to the AIM Exchange of the London Stock Exchange. Mr. Denton left DIC in February 2009 after completing the acquisition and transition of DIC to the Cookie Jar Company. Mr. Denton served as the Chief Financial Officer of Gold Circle Films from 2009 to 2011. From 2009 to 2014, Mr. Denton also owned and operated three Assisted Living Facilities for the Elderly, to help better care for his mother. Mr. Denton is a Certified Public Accountant and a member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants.

40.     Upon information and belief, Defendant Denton is a citizen of California.

**Defendant Davis**

41.     Defendant Davis has served as a Company director since December 2013. He has also served as a member of the Nominating Committee since March 19, 2020. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Davis beneficially owned 13,335 shares of the Company's common stock. Given that the price

per share of the Company's common stock at the close of trading on March 30, 2020 was $0.28, Defendant Davis owned approximately $3,734 worth of Genius stock.

42.    For the fiscal year ended December 31, 2019, Defendant Davis received $20,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

43.    The Company's 2020 Proxy Statement stated the following about Defendant Davis:

> *Joseph "Gray" Davis, 77,* has been a Director of the Company since December 2013. Mr. Davis served as the 37th governor of California from 1998 until 2003. Mr. Davis currently serves as "Of Counsel" in the Los Angeles, California office of Loeb & Loeb LLP. Mr. Davis has served on the Board of Directors of DIC Entertainment and is a member of the bi-partisan Think Long Committee, a Senior Fellow at the UCLA School of Public Affairs and Co-Chair of the Southern California Leadership Counsel. Mr. Davis received his undergraduate degree from Stanford University and received his Juris Doctorate from Columbia Law School. Mr. Davis served as lieutenant governor of California from 1995-1998, California State Controller from 1987-1995 and California State Assemblyman from 1982-1986. Mr. Davis was chosen as a director of the Company based on his knowledge of corporate governance.

44.    Upon information and belief, Defendant Davis is a citizen of California.

**Defendant Hallren**

45.    Defendant Hallren has served as a Company director since May 2014. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee and Nominating Committee. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Hallren beneficially owned 13,335 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2020 was $0.28, Defendant Hallren owned approximately $3,734 worth of Genius stock.

46.     For the fiscal year ended December 31, 2019, Defendant Hallren received $20,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

47.     The Company's 2020 Proxy Statement stated the following about Defendant Hallren:

> *P. Clark Hallren, 58,* has been a Director of the Company since May 2014. Since August 2013, Mr. Hallren has been a realtor with HK Lane/Christie's International Real Estate and since August 2012, Mr. Hallren has served as an outside consultant to individuals and entities investing or operating in the entertainment industry. From August 2012 to August 2014, Mr. Hallren was a realtor with Keller Williams Realty and from August 2009 to August 2012, Mr. Hallren founded and served as managing partner of Clear Scope Partners, an entertainment advisory company. From 1986 to August 2009, Mr. Hallren was employed by JP Morgan Securities Inc. in various capacities, including as Managing Director of the Entertainment Industries Group. In his roles with JP Morgan Securities, Mr. Hallren was responsible for marketing certain products to his clients, including but not limited to, syndicated senior debt, public and private subordinated debt, public and private equity, securitized and credit enhanced debt, interest rate derivatives, foreign currency and treasury products. Mr. Hallren holds Finance, Accounting and Economics degrees from Oklahoma State University. He also currently holds Series 7, 24 and 63 securities licenses. Mr. Hallren was chosen as a director of the Company based on his knowledge and experience in the entertainment industry as well as in banking and finance.

48.     Upon information and belief, Defendant Hallren is a citizen of California.

**Defendant Klein**

49.     Defendant Klein has served as a Company director since March 2019. He also serves as a member of the Audit Committee and the Nominating Committee. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Klein beneficially owned 175,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2020 was $0.28, Defendant Klein owned approximately $49,000 worth of Genius stock.

50.     For the fiscal year ended December 31, 2019, Defendant Klein received $12,500 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

51.     The Company's 2020 Proxy Statement stated the following about Defendant Klein:

> *Michael Klein*, *72*, was appointed as a Director of the Company since March 7, 2019. Mr. Klein is an accomplished executive, entrepreneur, and financier with substantial experience in media and entertainment, investment banking, professional sports, venture capital funding, and real estate. Prior to starting Camden Capital Management, LLC (CCM), Mr. Klein, since 1996, has led Klein Investment Group after assuming 100% ownership of (and renaming) Iacocca Capital Partners, L.P., where he was Managing Partner from 1994 to 1996. From 1984 to 1993, Mr. Klein was a managing director at Bear Stearns & Company, where he founded and co-directed the Media-Entertainment Group, and Gruntal & Company, where he was Senior Managing Director and a member of the Executive Committee. From 1974 to 1982, Mr. Klein supplied prime time and mini-series content to the major television networks through his company, Michael Klein Productions. Also, during that time, he was an owner and a senior executive officer of the San Diego Chargers, an NFL Football franchise. Mr. Klein has significant experience in the area of corporate financings. He has executed and participated in financing deals, both public and private, ranging from $5 million to over $2 billion. His real estate ventures in Southern California include a 600-acre development in North San Diego, which he sold in various stages. He also has led several real estate ventures in Southern California including the Water Gardens phase two in Santa Monica. Mr. Klein was chosen as a director of the Company based on his knowledge and experience in the entertainment industry as well as in banking and finance.

52.     Upon information and belief, Defendant Klein is a citizen of California.

**Defendant Loesch**

53.     Defendant Loesch has served as a Company director since March 2015 and as Executive Chairman of Kartoon Channel! since June 5, 2020. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Loesch beneficially owned 13,335 shares of

the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2020 was $0.28, Defendant Loesch owned approximately $3,734 worth of Genius stock.

54.     For the fiscal year ended December 31, 2019, Defendant Loesch received $17,500 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

55.     The Company's 2020 Proxy Statement stated the following about Defendant Loesch:

> *Margaret Loesch, 74,* has been a Director of the Company since March 2015 and the Executive Chairman of the Genius Brands Network since December 2016. Beginning in 2009 through 2014, Ms. Loesch, served as Chief Executive Officer and President of The Hub Network, a cable channel for children and families, including animated features. The Company has, in the past, provided The Hub Network with certain children's programming. From 2003 through 2009 Ms. Loesch served as Co-Chief Executive Officer of The Hatchery, a family entertainment and consumer product company. From 1998 through 2001 Ms. Loesch served as Chief Executive Officer of the Hallmark Channel, a family related cable channel. From 1990 through 1997 Ms. Loesch served as the Chief Executive Officer of Fox Kids Network, a children's programming block and from 1984 through 1990 served as the Chief Executive Officer of Marvel Productions, a television and film studio subsidiary of Marvel Entertainment Group. Ms. Loesch obtained her Bachelor of Science from the University of Southern Mississippi. Ms. Loesch was chosen to be a director based on her 40 years of experience at the helm of major children and family programming and consumer product channels.

56.     Upon information and belief, Defendant Loesch is a citizen of California.

**<u>Defendant Segall</u>**

57.     Defendant Segall has served as a Company director since December 2013. She also serves as the Chair of the Nominating Committee. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Segall beneficially owned 13,335 shares of the Company's common stock. Given that the price per share of the Company's common

stock at the close of trading on March 30, 2020 was $0.28, Defendant Segall owned approximately $3,734 worth of Genius stock.

58.    For the fiscal year ended December 31, 2019, Defendant Segall received $17,500 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

59.    The Company's 2020 Proxy Statement stated the following about Defendant Segall:

> *Lynne Segall, 67,* has been a Director of the Company since December 2013. Ms. Segall has served as the Senior Vice President and Publisher of The Hollywood Reporter since June 2011. From 2010 to 2011, Ms. Segall was the Senior Vice President of Deadline Hollywood. From June 2006 to May 2010, Ms. Segall served as the Vice President of Entertainment, Fashion & Luxury advertising at the Los Angeles Times. In 2005, Ms. Segall received the Women of Achievement Award from The Hollywood Chamber of Commerce and the Women in Excellence Award from the Century City Chamber of Commerce. In 2006, Ms. Segall was recognized by the National Association of Women with its Excellence in Media Award. Ms. Segall was chosen to be a director based on her expertise in the entertainment industry.

60.    Upon information and belief, Defendant Segall is a citizen of California.

## **Defendant Thomopoulos**

61.    Defendant Thomopoulos has served as a Company director since December 2013. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Thomopoulos beneficially owned 13,450 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 30, 2020 was $0.28, Defendant Thomopoulos owned approximately $3,766 worth of Genius stock.

62.    For the fiscal year ended December 31, 2019, Defendant Thomopoulos received $17,500 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

63.     The Company's 2020 Proxy Statement stated the following about Defendant Thomopoulos:

> *Anthony Thomopoulos, 82,* has been a Director of the Company since February 2014. Mr. Thomopoulos served as the Chairman of United Artist Pictures from 1986 to 1989 and formed Thomopoulos Pictures, an independent production company of both motion pictures and television programs in 1989 and has served as its Chief Executive Officer since 1989. From 1991 to 1995, Mr. Thomopoulos was the President of Amblin Television, a division of Amblin Entertainment. Mr. Thomopoulos served as the President of International Family Entertainment, Inc. from 1995 to 1997. From June 2001 to January 2004, Mr. Thomopoulos served as the Chairman and Chief Executive Officer of Media Arts Group, a NYSE listed company. Mr. Thomopoulos served as a state commissioner of the California Service Corps. under Governor Schwarzenegger from 2005 to 2008. Mr. Thomopoulos is also a founding partner of Morning Light Productions. Since he founded it in 2008, Mr. Thomopoulos has operated Thomopoulos Productions and has served as a consultant to BKSems, USA, a digital signage company. Mr. Thomopoulos is an advisor and a member of the National Hellenic Society and holds a degree in Foreign Service from Georgetown University and sat on its Board of Directors from 1978 to 1988. Mr. Thomopoulos was chosen as a director of the Company based on his entertainment industry experience.

64.     Upon information and belief, Defendant Thomopoulos is a citizen of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65.     By reason of their positions as officers, directors, and/or fiduciaries of Genius and because of their ability to control the business and corporate affairs of Genius, the Individual Defendants owed Genius and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Genius in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Genius and its shareholders so as to benefit all shareholders equally.

66.     Each director and officer of the Company owes to Genius and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Genius, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68.     To discharge their duties, the officers and directors of Genius were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Genius, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Genius's Board at all relevant times.

70.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business,

products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

71. To discharge their duties, the officers and directors of Genius were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Genius were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, California, and the United States, and pursuant to Genius's own Corporate Code of Conduct and Ethics and Whistleblower Policy (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Genius conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Genius and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Genius's operations would comply with all applicable laws and Genius's financial statements and regulatory filings filed with

the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72. Each of the Individual Defendants further owed to Genius and the shareholders the duty of loyalty requiring that each favor Genius's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73. At all times relevant hereto, the Individual Defendants were the agents of each other and of Genius and were at all times acting within the course and scope of such agency.

74. Because of their advisory, executive, managerial, and directorial positions with Genius, each of the Individual Defendants had access to adverse, non-public information about the Company.

75. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Genius.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

76.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

78.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Genius was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct

part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Genius and was at all times acting within the course and scope of such agency.

## GENIUS'S CODE OF CONDUCT

81. The 2020 Proxy Statement states, in pertinent part:

**CODE OF CONDUCT AND ETHICS**

**We have adopted a Corporate Code of Conduct and Ethics and Whistleblower Policy that applies to all of our officers, directors and employees.** A copy of the Code of Conduct and Ethics may be obtained, free of charge, by submitting a written request to the Company or on our website at *www.gnusbrands.com*. Disclosure regarding any amendments to, or waivers from, provisions of the code of conduct and ethics that apply to our directors, principal executive and financial officers will be posted on the "Investor Relations-Corporate Governance" section of our website at *www.gnusbrands.com* or included in a Current Report on Form 8-K within four business days following the date of the amendment or waiver.

(Emphasis added.)

82. The "Introduction" section of the Company's Code of Conduct states that it is meant to provide its "associates" with a "clear understanding of the principles of business conduct and ethics that are expected of them and to aid them in making ethical and legal decisions when conducting the company's business and performing day-to-day duties." The Code of Conduct defines the term "associate" as "(i) every full and part-time employee of the company and its subsidiaries, (ii) all members of the company's senior management, including the company's Chief Executive Officer and Chief Financial Officer, and (iii) every member of the company's Board of Directors, even if such member is not employed by the company."

83.    The Introduction section of the Code of Conduct further states that "[t]he standards set forth in the Code apply to us all. Every associate of the company must acknowledge his or her review of, and agreement to comply with, the Code as a condition of his or her relationship with the company…"

84.    The Introduction of the Code of Conduct goes on to state the following:

> The ultimate responsibility for maintaining our Code rests with each of us. As individuals of personal integrity, we can do no less than to behave in a way that will continue to bring credit to ourselves and our company. Applying these standards to our business lives is an extension of the values by which we are known as individuals and by which we want to be known as a company. To that end, the company has made the Code publicly available on its web site. It is our responsibility to conduct ourselves in an ethical business manner and also to ensure that others do the same. If any one of us violates these standards, he or she can expect a disciplinary response, up to and including termination of any employment or other relationship with the company, and possibly other legal action.

85.    In a section titled "Implementation of the Code," the Code of Conduct provides, in relevant part:

> Q:    Who is responsible for administering, updating and enforcing the Code?
>
> A:    The company's Board of Directors has appointed a Corporate Compliance Officer and a Compliance Committee that includes the Corporate Compliance Officer and at least one additional member to administer, update and enforce the Code. **Ultimately, the Board of Directors of the company must ensure that the Corporate Compliance Officer and the Compliance Committee fulfill their responsibilities**.

(Emphasis added.)

86.    In a section titled, "General Requirements," the Code of Conduct states the following, in relevant part:

Each associate of the company is expected to be honest, fair, and accountable in all business dealings and obligations, and to ensure:

• the ethical handling of conflicts of interest between personal and professional relationships;

• full, fair, accurate, timely and understandable disclosure in the reports required to be filed by the company with the Securities and Exchange Commission and in other public communications made by the company; and

• compliance with applicable governmental laws, rules and regulations.

87.     In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Conduct states the following:

The company expressly forbids any associate from trading on material non-public information or communicating material non-public information to others in violation of the law. This conduct is frequently referred to as "insider trading." This policy applies to every associate of the company and extends to activities both within and outside their duties to the company, including trading for a personal account.

88.     In a section titled, "Conflicts of Interest," the Code of Conduct states the following:

Associates and, in certain circumstances, their immediate family members, are prohibited from any of the following activities (excluding obvious market-level, arms-length type of activities in which the company would ordinarily engage) which could represent an actual or perceived conflict of interest:

***

• No associate shall use any company property or information or his or her position at the company for his or her personal gain.

***

In addition, the Audit Committee of the Board of Directors will review and approve, in advance, all related-person transactions, as required by

23

Verified Shareholder Derivative Complaint

the Securities and Exchange Commission, the NASDAQ Stock Market or any other regulatory body to which the company is subject.

Each associate should make prompt and full disclosure in writing to the Corporate Compliance Officer or a member of the Compliance Committee of any situation that may involve a conflict of interest. Failure to disclose any actual or perceived conflict of interest is a violation of the Code.

89.    In a section titled, "Protection and Proper Use of Company Assets," the Code of Conduct states the following:

Under law, the company is required to keep books, records and accounts that accurately and fairly reflect all transactions, dispositions of assets and other events that are the subject of specific regulatory record keeping requirements, including generally accepted accounting principles and other applicable rules, regulations and criteria for preparing financial statements and for preparing periodic reports filed with the Securities and Exchange Commission. All company reports, accounting records, sales reports, expense accounts, invoices, purchase orders, and other documents must accurately and clearly represent the relevant facts and the true nature of transactions. Reports and other documents should state all material facts of a transaction and not omit any information that would be relevant in interpreting such report or document.

90.    The "Protection and Proper Use of Company Assets" section of the Code of Conduct further states the following regarding the Company's disclosure controls and procedures:

The company has developed and maintains a system of internal controls to provide reasonable assurance that transactions are executed in accordance with management's authorization, are properly recorded and posted, and are in compliance with regulatory requirements. The system of internal controls within the company includes written policies and procedures, budgetary controls, supervisory review and monitoring, and various other checks and balances, and safeguards, such as password protection to access certain computer systems. The company has also developed and maintains a set of disclosure controls and procedures to ensure that all of the information required to be disclosed by the company in the reports that it files or submits under

Verified Shareholder Derivative Complaint

the Securities Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms. Associates are expected to be familiar with, and to adhere strictly to, these internal controls and disclosure controls and procedures.

91. The "Protection and Proper Use of Company Assets" section of the Code of Conduct goes on to provide that the Company's directors must comply with the following additional guidelines:

> Responsibility for compliance with these internal controls and disclosure controls and procedures rests not solely with the company's accounting personnel, but with all associates involved in approving transactions, supplying documentation for transactions, and recording, processing, summarizing and reporting of transactions and other information required by periodic reports filed with the Securities and Exchange Commission. Because the integrity of the company's external reports to shareholders and the Securities and Exchange Commission depends on the integrity of the company's internal reports and record-keeping, all associates must adhere to the highest standards of care with respect to our internal records 8 and reporting. The company is committed to full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by it with the Securities and Exchange Commission, and it expects each associate to work diligently towards that goal.

92. The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and violations of the Exchange Act, and failing to report the same. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

## Background

93.     Incorporated in Nevada, Genius is a California-based content and brand management company that creates and licenses multimedia content for toddlers to tweens.

94.     Specifically, the Company's entertainment property portfolio includes products such as Rainbow Rangers for Nick Jr., Llama Llama for Netflix, Baby Genius, Thomas Edison's Secret Lab, Warren Buffet's Secret Millionaire's Club, and the upcoming Stan Lee's Superhero Kindergarten. Genius's products are distributed across a number of platforms, including Comcast's Xfinity on Demand, AppleTV, Roku, Amazon Fire, YouTube, Amazon Prime, Cox, Dish, Sling, Zumo, and Connected TV.

95.     Genius was originally founded in 2006, and operated as a private company until becoming a publicly traded company in 2009. The Company was formerly known as Pacific Entertainment Corporation until it changed its corporate name to Genius upon reincorporating in Nevada in 2011. As a result of a merger in 2013, the Company acquired the business and operations of multimedia and entertainment company A Squared Entertainment LLC ("A Squared").

96.     Historically, the Company's stock traded at relatively low prices, ultimately becoming a "penny stock" by mid-July 2019, at which time Genius's stock traded at less than $1.00 per share. For example, on July 23, 2019, the Company's stock closed at approximately $0.91 per share; on December 31, 2019, the Company's stock closed at approximately $0.27 per share; and on May 1, 2020, the Company's stock closed at approximately $0.31 per share.

97.     During this period, Genius was in danger of being delisted from the NASDAQ, as the NASDAQ's continued listing requirements mandate that a company's share price remain equal to or greater than $1.00 per share. In fact, on March 5, 2020, the Company revealed in a Form 8-K filed with the SEC that "[i]f the Company does not meet the minimum bid requirement during the additional 180-day grace period, Nasdaq will

provide written notification to the Company that its common stock will be subject to delisting."

98.     Moreover, according to the 2019 10-K, Genius incurred an operating loss each fiscal quarter since its inception. The 2019 10-K further provides that while the Company's revenue had increased from $999,452 in 2018 to $5,907,899 in 2019, the Company incurred a net loss of nearly $2.48 million more in 2019 than it did in 2018 due to skyrocketing costs and expenses.

99.     The Company's 2019 10-K states the following, in relevant part:

We will need to generate additional revenue and/or reduce costs to achieve profitability. We are beginning to generate revenues derived from our existing properties, properties in production, and new brands being introduced into the marketplace. However, the ability to sustain these revenues and generate significant additional revenues or achieve profitability will depend upon numerous factors some of which are outside of our control.

\* \* \*

**We will need additional financing to continue our operations. If we are unable to obtain additional financing on acceptable terms, we will need to curtail** or **cease our development plans and operations.**

As of December 31, 2019, we had approximately $305,000 of available cash, cash equivalents, and restricted cash. Following various financings during the first quarter of 2020, as of March 28, 2020, we had approximately $2.8 million of cash and cash equivalents. Additional funds may be required to fund operations and repay our outstanding debt which could be raised through the issuance of equity securities and/or debt financing. There is no assurance that any type of financing on terms acceptable to us will be available or will otherwise occur. Debt financing must be repaid regardless of whether we generate revenues or cash flows from operations and may be secured by substantially all of our assets. Any equity financing or debt financing that requires the issuance of warrants or other equity securities to the lender would cause the percentage ownership by our current stockholders to be diluted, which dilution may be substantial. Also, any

additional equity securities issued may have rights, preferences or privileges senior to those of existing stockholders. If we obtain stockholder approval, any equity financing at a price below the then current conversion price of our March 2020 Secured Convertible Notes or the exercise price of the March 2020 Warrants will result in an adjustment to the conversion price or exercise price applicable to such securities, resulting in the potential issuance of additional shares of our common stock upon the conversion or exercise of such securities, which would further dilute our other stockholders.

**If we are not able to obtain sufficient capital, we may then be forced to limit the scope of our operations.**

We expect that as our business continues to evolve, we will need additional working capital. If adequate additional debt and/or equity financing is not available on reasonable terms or at all, we may not be able to continue to expand our business, and we will have to modify our business plans accordingly. These factors could have a material adverse effect on our future operating results and our financial condition.

If we reach a point where we are unable to raise needed additional funds to continue as a going concern, we could be forced to cease our activities and dissolve our company. In such an event, we will need to satisfy various creditors and other claimants, severance, lease termination and other dissolution-related obligations.

100.   As is detailed in the Company's quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2020 (the "1Q20 10-Q"), Genius maintained low liquidity as its liabilities far outweighed its cash assets, resulting in negative working capital.

**The Company Conducts a Series of Stock Offerings as the Individual Defendants Issue False and Misleading Statements to the Public**

101.   In light of the Company's dearth of working capital, the pressure to maintain the Company's NASDAQ listing, and the onset of increased costs and expenses, as particularized in the Company's 1Q20 10-Q, the Individual Defendants endeavored to conduct a series of offerings of Company stock and convertible notes during the Relevant Period in order to secure the funds the Company needed. Concurrently, the Individual Defendants made numerous statements to the investing public that grossly exaggerated the

Company's business outlook and growth prospects, in order to artificially pump up the price of the Company's stock.

102. On March 17, 2020, the Company entered into an agreement to raise $11 million through the issuance of Senior Secured Convertible Notes (the "Notes").

103. On March 23, 2020, the Company filed a current report on Form 8-K (the "March 23 Form 8-K") and one day later, on March 24, 2020, the Company filed a prospectus supplement on Form 424B5 (the "March 24 Form 424B5") (collectively, the "March 24 Offering Documents") in connection with a direct offering of 4,000,000 shares of the Company's common stock to long-standing investors at $0.25 per share, approximately $0.06 below its market value at the time of the offering. Total gross proceeds from the offering equaled approximately $1 million. The March 24 Offering Documents explained that the Company intended to use the net proceeds for its "general corporate purposes."

104. On May 7, 2020, the Company filed a prospectus supplement on Form 424B5 (the "May 7 Form 424B5") and a current report on Form 8-K (the "May 7 Form 8-K") (collectively, the "May 7 Offering Documents") with the SEC in connection with another direct offering of 8,000,000 shares of the Company's common stock to long-standing investors a $0.35 per share, approximately $0.13 below its market value at the time of the offering. Total gross proceeds from the offering equaled approximately $2.8 million. The May 7 Offering Documents explained that the Company intended to use the net proceeds for "working capital and general corporate purposes, including to fund production of additional episodes of its series, Rainbow Rangers, and to grow its newly-announced digital network for children and families, Kartoon Channel!."

105. On May 7, 2020, the Company also put out a press release titled "Genius Brands International Announces $2.8 Million Registered Direct Offering" (the "May 7 Press Release") announcing that it had entered into a securities purchase agreement with "certain long-standing investors." The May 7 Press Release reiterated, in pertinent part,

that the offering was for the purchase and sale of 8 million shares of its common stock at a purchase price of $0.35 per share in a registered direct offering, resulting in total gross $2.8 million.

106.   The May 7 Press Release went on to provide, in relevant part:

The net proceeds of the financing will be used for working capital and general corporate purposes. In addition, Genius Brands intends to use the proceeds to fund production of additional episodes of its series, *Rainbow Rangers*, which will debut on Nick Jr. in conjunction with the launch of the toy line from Mattel, Inc. at Walmart stores Q3 2020. The Company will also apply the financing to grow its newly-announced digital network for children and families, *Kartoon Channel!*, which will launch in June 2020 with availability in over 100M U.S. television households.

107.   Only four days after the filing of the May 7 Offering Documents, the Company filed a prospectus supplement on Form 424B5 with the SEC dated May 11, 2020 (the "May 11 Form 424B5") in connection with a direct offering of 12,000,000 shares of the Company's common stock to long-standing investors a $0.45 per share, approximately $0.38 below its market value at the time of the offering. Total gross proceeds from the offering equaled approximately $5.4 million. The May 11 Form 424B5 explained that the Company intended to use the net proceeds for its "operations and for other general corporate purposes, including, but not limited to, the development, production, and distribution of animated content and associated licensed merchandise, general working capital and possible future acquisitions."

108.   The Company published a shareholder letter on May 13, 2020 (the "May 13 Shareholder Letter") in which Defendant Heyward announced the following, in relevant part:

It has been a busy week and an exciting week for Genius Brands, and with all of this news, there was a surge of activity buying Genius Brands shares, and the stock price rose as a result. Based on that, we did a cash raise to provide adequate '*gunpowder*' to fund new episodes of RAINBOW RANGERS on air, to coincide when toys go on shelf at

> Walmart in August, as well as have funds to ensure first-class build-out of *Kartoon Channel!* when we go live on June 15, including not only content acquisitions and marketing, but on-air branding--bumpers, graphics, and musical stings, etc.

109.   On May 18, 2020, the Company filed the 1Q20 10-Q, which, among other things, set forth the Company's financial woes for the fiscal quarter ended March 31, 2020, stating, in pertinent part, that, "Licensing and Royalty revenue decreased $146,821, or 42%" and "Television & Home Entertainment revenue decreased $797,890, or 94%, primarily due to the revenue generated from the delivery of *Rainbow Rangers* to the Viacom Media Network in January 2019 without comparable revenue in 2020."

110.   The 1Q20 10-Q also provided that, as of March 31, 2020, the Company had $2,760,048 in cash and cash equivalents and $19,290,901 in liabilities, resulting in negative working capital of $9,198,824, compared to only a negative working capital of $3,650,136 as of December 31, 2019.

111.   That same day, May 18, 2020, the Company filed a current report on Form 8-K (the "May 18 Form 8-K") and one day later, May 19, 2020, filed a prospectus supplement on Form 424B5 (the "May 19 Form 424B5") (collectively, the "May 19 Offering Documents") with the SEC in connection with a direct offering of 7,500,000 shares of the Company's common stock to long-standing investors at $1.20 per share, approximately $0.30 below its market value at the time of the offering. Total gross proceeds from the offering equaled approximately $9 million. The May 19 Offering Documents explained that the Company intended to use the net proceeds to "grow its newly-announced digital network for children, Kartoon Channel!, to fund production of additional episodes of its series Rainbow Rangers, and for the repayment of certain outstanding debt, and for working capital!."

112.   Approximately 10 days later, the Company filed a current report on Form 8-K (the "May 28 Form 8-K") and the next day, May 29, 2020, filed a prospectus supplement on Form 424B5 (the "May 29 Form 424B5") (collectively, the "May 29 Offering

Documents") with the SEC in connection with another direct offering of 20,000,000 shares of the Company's common stock to long-standing investors a $1.50 per share, approximately $0.33 below its market value at the time of the offering. Total gross proceeds from the offering equaled approximately $30 million. The May 29 Offering Documents explained that the Company intended to use the net proceeds to "repay certain outstanding debt and for working capital and general corporate purposes, including to fund production of additional episodes of our series, Rainbow Rangers, and to grow our newly-announced digital network for children and families, Kartoon Channel!."

113.   On June 8, 2020, the Company issued a statement via press release titled "Genius Brands International Responds to Misleading Short Seller Criticisms" (the "June 8 Press Release") in which Defendant Heyward responded to short seller criticisms contained in the Hindenburg Report. In response, Defendant Heyward stated the following, in relevant part:

> On a personal note, *I have not sold a single share, and in fact, have materially increased my holdings in the Company in the last two years*. We take the views of all our investors seriously, and we and our board are committed to maintaining the highest standards of corporate governance and transparency."

114.   On June 11, 2020, only four days before the launch of the Company's highly-touted Kartoon Channel!, the Company filed a prospectus on Form 424B3 (the "June 11 Form 424B3") registering over 60 million shares of its common stock for resale by a group of "selling shareholders" at a listed price of $4.51 per share.

115.   Also on June 11, 2020, The Motley Fool published an article titled "3 Things Genius Brands Stock Bulls Need to Happen Soon"[5] in which it laid out what investors would be watching for to justify the Company's inflated valuation. In relevant part, the article stated:

---

[5] https://www.fool.com/investing/2020/06/11/3-things-genius-brands-stock-bulls-need-to-happen.aspx (last visited August 28, 2020).

Verified Shareholder Derivative Complaint

**2. Genius Brands' selling shareholders need to cancel their stock offering**

As often happens when a stock price soars, early investors in Genius Brands are looking for the exits. **If Genius really wants to avoid the appearance of a pump-and-dump scheme, then it should urge those selling shareholders to reconsider**.

Regardless of the true motivation behind the stock offering, the optics look terrible. During May, Genius Brands sold stock to "certain long standing investors" at prices ranging from $0.35 to $1.50 per share, raising gross proceeds of about $47.25 million. That followed the issuance of secured convertible notes and warrants in March to certain accredited investors, including Heyward. The warrants gave investors the right to buy stock at $0.21 per share, and now Genius Brands is registering the shares to allow those investors to sell the stock acquired through the warrants at much higher current prices.

To be fair, Heyward isn't listed as a selling shareholder, and the prospectus for the sale doesn't list the Genius Brands CEO as being affiliated with any of the limited partnerships and other investment groups that are selling shares. Nevertheless, with expectations of selling more than 60 million shares, the desire to cash out quick is evident -- and actions speak louder than the words of those trying to reassure current shareholders not to draw inferences from the move.

116.   Only 11 days after Defendant Heyward assured investors that he had not "sold a single share," on June 19, 2020, Defendant Heyward sold 460,574 shares at $2.94 per share for gross proceeds in the amount of approximately $1.3 million.

117.   On June 23, 2020, the Company issued a press release announcing that it had come to an agreement with all of its existing senior secured convertible noteholders to have the noteholders pre-pay their Notes for an aggregate of $4 million, three months early and then have the noteholders convert all of their $13.75 million of debt to equity.

118.   The Individual Defendants knew their statements were false, misleading, exaggerated, and overly optimistic, yet, the Individual Defendants continued to knowingly circulated false statements and omissions of material fact regarding the Company's

products, assets, and growth potential to artificially inflate the price so as to profit and stave off Genius's burial in an insurmountable debt. Moreover, the Individual Defendants have since failed to correct or clarify their false and misleading statements and omissions of material fact.

**False and Misleading Statements**

***March 17 Press Release***

119.   On March 17, 2020, the Company issued a press release titled "Nickelodeon Expands Daily Broadcasts of Genius Brand International's Hit Preschool Series, Rainbow Rangers" (the "March 17 Press Release") announcing that Nickelodeon had increased the broadcast of the Company's preschool series, Rainbow Rangers, to 26 airings per week. The March 17 Press Release states the following, in relevant part:

> **Nick Jr. now airs *Rainbow Rangers* Monday – Friday, four airings per day, and six airings on the weekends. The animated action-adventure series premiered on Nick Jr. in November 2018 with five airings per week and has consistently achieved high ratings with its target demo of Girls 2 – 5-years-old. The additional airings of *Rainbow Rangers,* which represents a five-fold increase (400+%)**, are complimented by content available via video on demand platforms and the brand's robust YouTube channel where viewers have consumed over 22.5 million minutes of *Rainbow Rangers'* content in the last year.

(Emphasis added.)

***March 20 Press Release and Shareholder Letter***

120.   On March 20, 2020, by way of press release (the "March 20 Press Release"), the Company published a shareholder letter penned by Defendant Heyward to shareholders, which stated, in relevant part, "*Cartoons endure*. We announced Tuesday that *Rainbow Rangers* is now up to 26 broadcasts a week on Nick Jr.!!!"

121.   Defendant Heyward reiterated his statements referenced above in his remarks on a conference call on that same day (the "March 20 Conference Call").

***March 23 Press Release***

122.   In a press release dated March 23, 2020 (the "March 23 Press Release"), the Company stated, in relevant part, that "[Rainbow Rangers] premiered in the U.S. in November 2018 on Nickelodeon's **Nick Jr.** and has since achieved a 400+% increase in airtime with *Rainbow Rangers* now airing 26x each week."

***March 24 Offering Documents***

123.   On March 24, 2020, the Company filed the March 24 Offering Documents with the SEC in connection with the Company's direct offering of shares of its common stock. The March 24 Offering Documents stated, in relevant part:

*Content in Production*

*Rainbow Rangers Season 2*: From Shane Morris, the writer of Frozen, and Rob Minkoff, the director of The Lion King, Rainbow Rangers is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. We have partnered with Mattel Inc.'s Fisher Price Toys as the master toy partner for the series, and Viacom's Nick Jr. has licensed the series for broadcast in the US. Numerous international broadcast agreements have been signed and several more are currently being negotiated in various territories. Viacom has ordered a second season of the series consisting of 26 half-hour episodes that are currently in production, the first of which have been delivered.

\* \* \*

*Already Released Content*

*Rainbow Rangers*: The series premiered on Nick Jr. in November 2018 and we completed 26 half hour episodes in February 2019. The series was created by Shane Morris, the co-writer of Frozen, and Rob Minkoff, the director of The Lion King, Rainbow Rangers is an animated series about the adventures of seven magical girls from

Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. A global licensing program is in place and the first products will be introduced to the market in second quarter of 2019.

124.   The March 24 Offering Documents merely provided a generic update of the Company's flagship product, Rainbow Rangers, but failed to correct or clarify statements made in the March 17 Press Release regarding increased broadcasting or the status of negotiations with Nickelodeon pertaining to the renewal of the show for a third season.

***2019 Form 10-K***

125.   On March 30, 2020, the Company filed the 2019 10-K. The 2019 10-K was signed by Defendants Heyward, Denton, Davis, Hallren, Klein, Loesch, Segall, and Thomopoulos, and contained Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Heyward and Denton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

126.   The 2019 10-K stated the following regarding the Company's internal controls:

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2019. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework (2013 Framework).*

**Based on this assessment, our management, with the participation of our Chief Executive Officer (principal executive officer) and our Chief Financial Officer (principal financial and accounting officer), has concluded that, as of December 31, 2019, our internal control over financial reporting were effective based on those criteria**.

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the ''Exchange Act''). Disclosure controls and procedures include, without limitation, controls and procedures that are designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Based upon our evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective for the year ended December 31, 2019 in ensuring that information that we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the fourth quarter of our last fiscal year that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added in bold and not italics, except headings.)

*March 31 Press Release*

127.   In a press release issued on March 31, 2020 (the "March 31 Press Release"), the Company stated, in relevant part, that Rainbow Rangers "airs on Nick Jr. in the U.S. Monday – Friday with four airings per day, and six airings on the weekends…"

*April 20 Press Release, Shareholders Letter, and Conference Call*

128.   By way of press release, the Company released a letter from Defendant Heyward to shareholders on April 20, 2020 (the "April 20 Press Release") in which he

stated that launching Stan Lee's Superhero Kindergarten on Amazon and Alibaba was "[p]lutonium in a bottle" and affirmed that Genius is "positioned to explode" in 2020.

129.   On the conference call that same day (the "April 20 Conference Call"), Defendant Heyward reiterated his statements referenced above in his remarks to investors.

### *2020 Proxy Statement*

130.   On April 14, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Heyward, Davis, Hallren, Klein, Loesch, Segall, and Thomopoulos solicited the 2020 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

131.   With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated, "[w]e have adopted a Corporate Code of Conduct and Ethics and Whistleblower Policy that applies to all of our officers, directors and employees."

132.   The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

133.   The 2020 Proxy Statement also called for shareholder approval of, among other things: (1) the approval, for purposes of complying with Nasdaq Listing Rule 5635(d), of the issuance of shares of common stock upon conversion, exercise, exchange or otherwise pursuant to the terms of a securities purchase agreement dated March 11, 2020 and the convertible notes and warrants to purchase common stock and the warrants issued to the placement agent (the "Issuance Proposal 1"); (2) approval, for purposes of complying with Nasdaq Listing Rule 5635(c), the issuance of shares of common stock upon

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

conversion, exercise, exchange or otherwise to Defendant Heyward pursuant to the terms of a securities purchase agreement dated March 11, 2020 and the related convertible notes and warrants (the "Issuance Proposal 2"); and (3) approval of a proposed amendment to the Company's Articles of Incorporation to increase the authorized number of shares of Genius's common stock from 233,333,334 to 650,000,000 (the "Amendment Proposal").

134.   The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (2) Kartoon Channel! would be available to Amazon Prime members only as an add-on channel for an additional subscription fee; (3) Kartoon Channel! platform was not as robust of an offering as the Individual Defendants purported; (4) the commercial viability of the Company was overstated in light of the true accuracy of the Company's products and assets; and (5) the Company failed to maintain internal controls. Due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

135.   As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders approved Issuance Proposals 1 and 2 and denied the Amendment Proposal.

### May 7 & 11 Offering Documents

136.   On May 7, 2020 and May 11, 2020, the Company filed the May 7 Offering Documents and May 11 Offering Documents, respectively, with the SEC in connection with the Company's direct offering of shares of its common stock. The May 7 Offering Documents and May 11 Offering Documents stated in, in relevant part:

<u>Content in</u> Production

*Rainbow Rangers Season 2*: From Shane Morris, the writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, *Rainbow Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's

trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. We have partnered with Mattel Inc.'s Fisher Price Toys as the master toy partner for the series, and Viacom's Nick Jr. has licensed the series for broadcast in the US. Numerous international broadcast agreements have been signed and several more are currently being negotiated in various territories. Viacom has ordered a second season of the series consisting of 26 half-hour episodes that are currently in production, the first of which have been delivered.

* * *

*Already Released* Content

*Rainbow Rangers*: The series premiered on Nick Jr. in November 2018 and we completed 26 half hour episodes in February 2019. The series was created by Shane Morris, the co-writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, *Rainbow Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. A global licensing program is in place and the first products will be introduced to the market in second quarter of 2019.

137.   The May 7 Offering Documents and May 11 Offering Documents merely provided a generic update of the Company's flagship product, Rainbow Rangers, but failed to correct or clarify statements made in the March 17 Press Release regarding increased broadcasting or the status of negotiations with Nickelodeon pertaining to the renewal of the show for a third season.

**May 13 Press Releases & Shareholder Letter**

138.   In a separate May 13, 2020 press release (the "May 13 Press Release"), Defendant Heyward stated, in relevant part, that he is "pleased to report that Genius Brands is in a stronger position today than ever before in its history" and that the Company sees "robust and accelerated revenue growth coming forth" in the animated content arena.

139.   Genius circulated the May 13 Shareholder Letter in which it publicized the Company's Kartoon Channel!, and stated, in relevant part, that:

> *Kartoon Channel!* is what we like to call a 'Netflix for kids', except it is free.  There is no subscription fee.  It is fully ad-supported. It is a pure cartoon play, with no 'natural predators', and what one of our board members described as an "*economic vaccine for COVID-19.*"

140.   The May 13 Press Release continued as follows, in pertinent part:

> In addition, *Kartoon Channel!* has acquired a large (almost 4,000 episodes!) and carefully curated number of animated programs ranging from *Archie's Weird Mysteries* to *Minecraft; Journey to the End*, to *Gummy Bear and Friends*, that are safe, fun, and without violence, negative stereotypes, or objectionable language.
>
> Though we can't compare ourselves to linear cable channels, it should be noted that when Disney Channel, Nickelodeon, and Cartoon Network all went on the air, they started with a 10 million order of magnitude subscribers. *Kartoon Channel!* is an 'on-demand' channel which means like Netflix, we offer a *menu* of offerings and the *viewe*r then determines which program he or she chooses to watch. Having said the above, *when Kartoon Channel!* goes live on June 15, it will be available in over 100 million U.S. television households, and over 200 million mobile devices. All free to the viewer.  All ad-supported.(with the exception of a small tranche of platforms, where the viewer can elect an SVOD option with no commercials)  If you have Amazon Prime, you can see it.  If you have Apple TV, you can see it. If you have Comcast, Cox, or DISH and Sling TV, you can see it.  I cannot recall any children's channel ever starting with such complete distribution, on Day 1, *and let alone, at a time when the demand could not possibly be higher.*

### *May 18 Form 10-Q*

141.   The 1Q20 10-Q was signed by Defendant Heyward and Denton, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Heyward and Denton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the

Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

142.   The 1Q20 10-Q stated the following regarding the Company's internal controls:

**Changes in Internal Control over Financial Reporting**
There were no changes in our internal control over financial reporting that occurred during the quarter ended March 31, 2020, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *May 19 Offering Documents*

143.   On or about May 19, 2020, the Company filed the May 19 Offering Documents with the SEC in connection with the Company's direct offering of shares of its common stock. The May 19 Offering Documents stated in, in relevant part:

<u>*Content in* Production</u>

*Rainbow Rangers Season 2*: From Shane Morris, the writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, *Rainbow Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. We have partnered with Mattel Inc.'s Fisher Price Toys as the master toy partner for the series, and Viacom's Nick Jr. has licensed the series for broadcast in the US. Numerous international broadcast agreements have been signed and several more are currently being negotiated in various territories. Viacom has ordered a second season of the series consisting of 26 half-hour episodes that are currently in production, the first of which have been delivered.

\* \* \*

<u>*Already* Released *Content*</u>

*Rainbow Rangers*: The series premiered on Nick Jr. in November 2018 and we completed 26 half hour episodes in February 2019. The series was created by Shane Morris, the co-writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, *Rainbow Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. A global licensing program is in place and the first products will be introduced to the market in second quarter of 2019.

144.   The May 19 Offering Documents merely provided a generic update of its flagship product, Rainbow Rangers, but failed to correct or clarify statements made in the March 17 Press Release regarding increased broadcasting or the status of negotiations with Nickelodeon pertaining to the renewal of the show for a third season.

### May 29 Offering Documents

145.   On or about May 29, 2020, the Company filed the May 29 Offering Documents with the SEC in connection with the Company's direct offering of shares of its common stock. The May 29 Offering Documents stated in, in relevant part:

<u>Content in</u> Production

*Rainbow Rangers Season 2*: From Shane Morris, the writer of Frozen, and Rob Minkoff, the director of The Lion King, Rainbow Rangers is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. We have partnered with Mattel Inc.'s Fisher Price Toys as the master toy partner for the series, and Viacom's Nick Jr. has licensed the series for broadcast in the US. Numerous international broadcast agreements have been signed and several more are currently being negotiated in various territories. Viacom has ordered a second season of the series consisting of 26 half-

hour episodes that are currently in production, the first of which have been delivered.

\* \* \*

_Already Released Content_

_Rainbow Rangers_: The series premiered on Nick Jr. in November 2018 and we completed 26 half hour episodes in February 2019. The series was created by Shane Morris, the co-writer of _Frozen_, and Rob Minkoff, the director of _The Lion King_, _Rainbow Rangers_ is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. A global licensing program is in place and the first products will be introduced to the market in second quarter of 2019.

146.   The May 29 Offering Documents merely provided a generic update of its flagship product, Rainbow Rangers, but failed to correct or clarify statements made in the March 17 Press Release regarding increased broadcasting or the status of negotiations with Nickelodeon pertaining to the renewal of the show for a third season.

**June 5 Press Release & Shareholder Letter**

147.   On June 5, 2020, the Company issued a press release (the "June 5 Press Release") in which Defendant Heyward commented, in pertinent part:

There is a huge appetite for quality children's content that is family-friendly and safe. **No less important, is having it available for free and with no subscription fees** will be compelling now to more and more parents who are looking to provide quality children's entertainment options for their kids. It will be equally important to advertisers, who are increasingly finding fewer channels to reach viewers, in a universe dominated by pay services such as Netflix and Disney+. _**Kartoon Channel!**_ **will be like a 'Netflix for kids, except it is free**.

(Emphasis added.)

148.   Defendant Heyward reiterated and expanded upon his comments that day in a letter to shareholders also released June 5, 2020 (the "June 5 Shareholder Letter"), in which he wrote, in relevant part:

> We previously described *Kartoon Channel*!  like "a Netflix for kids, but its free."  Our model is what is called in the industry, AVOD (Advertiser Video On Demand). There is an important significance to this, which in today's children's broadcast world, brings powerful 'wind to our sails'.
>
> 1. Netflix and Disney +, viewership is dramatically up, because people are staying at home more.  For a combination of COVID-19 and social reasons, this is even more so for children's TV (e.g. most schools closed,    many    summer    camps    have    been    canceled).
>
> 2. Children's Advertiser Demand is UP, while Available Inventory is Scarce.  Inventory is *scarce*, because more and more kids have migrated from *linear channels to On Demand channels* and much of that On Demand viewing is on Netflix and on Disney+ ***where there is no advertising***.  The result is that advertisers need to scramble to find commercial inventory and 'eyeballs' through which to promote their products, and brands.
>
> *Kartoon* Channel*!* will launch with a number of 'programming events', which we believe will be extremely compelling for kids, and which we will announce for you the week before launch.

(Emphasis added.)

149.   The statements and omissions referenced in ¶¶ 119–123, 125–129, 136, 138–143, 145, and 147–148 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (2) Kartoon Channel! would be available to Amazon Prime members only as an add-on channel for an additional

subscription fee; (3) Kartoon Channel! platform was not as robust of an offering as the Individual Defendants purported; (4) the commercial viability of the Company was overstated in light of the true accuracy of the Company's products and assets; and (5) the Company failed to maintain internal controls. Due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Gradually Emerges as False and Misleading Statements Continue**

### *June 7 Hindenburg Research Report*

150.  On June 5, 2020, Hindenburg Research published the Hindenburg Report, casting doubt on the Company's recently inflated valuation and revealing inaccuracies in the Company's public declarations.

151.  For example, with respect to Genius's flagship show, Rainbow Rangers, the Hindenburg Report unveiled, in relevant part, that:

> **Rainbow Rangers—The Company Has Boasted That the Show Is Currently Airing on Nick Jr. True, But It Appears Once Per Day During the Week at 3:49AM EST And Three Times On Sundays. The Show Is Currently Not Yet Slated For a 3rd Season and It Is Unclear Whether It Will Be Renewed.**
>
> Rainbow Rangers is another key show for the company, and in this case Genius *does* own the intellectual property behind the show, making it perhaps the company's most economically relevant property. It airs on Nick Jr. and has completed 2 seasons to date.
>
> The company made a big deal about its pick-up by Nick Jr. in a <u>January 2019 press release</u> announcing that the show had 455,000 viewers in its premiere:
>
> *"We have just received the Nielsen ratings for our latest premiere episode (Sunday, Jan. 6) of* Rainbow Rangers *on Nick Jr., which generated our highest premiere episode rating to date with 455,000 viewers!*

*The premiere episodes are broadcast on Sundays at 11:30 AM, and the encore episodes are broadcast* Monday *through Friday in the afternoon.*

*And, the strong and growing viewership on Nick Jr. points to an increasing appetite by kids for* Rainbow *Rangers and the coming tsunami of products at retail." The press release says.*

**Then, the company <u>stated</u> in March 2020 that it was airing 26 times per week**, giving it broad coverage in apparently favorable time slots:

*"Monday-Friday, four airings per day, and six airings on the weekends. The animated action-adventure series premiered on Nick Jr. in November 2018 with five airings per week and has consistently achieved high ratings with its target demo of Girls 2–5-years-old."*

**But the Rainbow Rangers schedule now says otherwise**. Most weekdays look like <u>this schedule</u>, from yesterday, **where the show has one time slot on Nick Jr. at 3:49AM EST.**

Verified Shareholder Derivative Complaint

Several platforms show us the same, **indicating it airs 9 times per week, instead of 26**: each morning at 3:49am and then twice additionally on Sunday mornings at 6:00a and 6:30a EST. We emailed the company to ask about its current number of airings and have not heard back as of this writing.

As Genius's CEO said in the March 2020 press release regarding the show being aired 26 times:

*"Needless to say, leading broadcasters like Nickelodeon don't make schedule changes of this* magnitude *without good reason…"*

He has not commented thus far on the "good reason" for the show airing in the witching hours of early morning only 9 times per week.

Similarly, there is no indication that a Season 3 has been picked up by Nick Jr. We e-mailed both Nick Jr. the company to try to get confirmation of a Season 3 but investor relations simply stated that negotiations were "underway".

We find it surprising that Nick Jr. is still in negotiations. Other shows such as "PAW Patrol" "Blues Clues" and "Bubble Guppies" were already announced as being picked up by Nickelodeon in February. Season 2 of Rainbow Rangers was ordered in April of 2019 in preparation for its release in October. We are now in June 2020 with no word on the series heading into the fall.

152.   On this news, the price of the Company's stock dropped by roughly 13%, falling from $6.86 per share at the close of trading on June 4, 2020, to $5.94 per share at the close of trading on June 5, 2020.

### June 8 Press Release

153.   In response to the Hindenburg Report, the Company distributed the June 8 Press Release in which Defendant Heyward stated the following, in relevant part:

**We are well positioned to create substantial value** – With Kartoon Channel! launching on June 15 and to be available in more than 100 million U.S. TV households and 200 million mobile devices, we are positioned to be one of the preeminent ad-supported kids' digital

*networks*. The service referred to as a 'Netflix for kids' is made even stronger by the distinct fact that it is a free service. There are no subscriptions fees, it is ad-supported.

### June 11 Form 424B3

154.   On June 11, 2020, the Company filed the June 11 Form 424B3 in which it incorporated by reference the 2019 Form 10-K, the 2020 Proxy Statement, the May 7 Form 8-K, May 8 Form 8-K, the May 18 Form 8-K, and May 28 Form 8-K. The June 11 Form 424B3 fails to correct or clarify previous false and misleading statements made in the foregoing documents as set forth herein.

### June 12 Press Release

155.   On June 12, 2020, the Company published a press release titled "Genius Brands International Launches The New 'Kartoon Channel!' Monday June 15 in Over 100 Million U.S. Television Households and 200 Million Mobile Devices With Over 4,000 Episodes of Family-Friendly Content" (the "June 12 Press Release") announcing its anticipated launch of its "new free digital" channel, Kartoon Channel!. The June 12, 2020 Press Release stated, in relevant part:

> Described as like a '*Netflix for kids, but free,*' *Kartoon Channel!* will have many of the world's most recognized children's brands, from many of the world's most successful creators of children's and family content.   With *content* coming from the late Stan Lee, for example; *distribution* through the likes of Amazon Prime/Amazon Fire, Apple TV/Apple IOS, Android, Roku and DISH, among others; and *proven value building programmers*…like Margaret, David, and Caroline, this is like putting rocket fuel in a Ferrari and having the Championship Formula 1 driving team at the wheel…
>
> * * *
>
> "Unlike other subscription services, *Kartoon Channel!* is an *ad-supported service and will be 100% free, making it available to all*.  We believe that is particularly meaningful in these times where many kids are home from school and summer camps, viewership is up, and parents are looking to find cost effective ways to provide positive

entertainment. [The channel will go live on Monday with immediate access to the services and more rolling out.]"

### Kartoon Channel! Launch

156.   On or about June 15, 2020, the Company launched its anticipated Kartoon Channel! on various digital platforms including on Amazon Channels, the suite of add-on channels available to subscribers of Amazon Prime. However, contrary to repeated statements made by Defendants Heyward and Loesch and Company press releases, Kartoon Channels! came with the price tag of $3.99 per month in addition to the cost of an Amazon Prime membership, as evidenced below:



157.   Upon launch, contrary to repeated statements made by the Individual Defendants leading up to the launch of Kartoon Channel!, investors quickly learned that Kartoon Channel! was only available to Amazon Prime members as an add-on channel for an additional subscription fee.[7]

---

[7] Dan Ariely, PREDICTABLY IRRATIONAL: THE HIDDEN FORCES THAT SHAPE OUR DECISIONS (2d ed. 2010) (explaining the power of "free" demonstrates that "free" is far more effective than "almost free").

158.   On this news, the price of the Company's stock dropped from $4.41 per share at the close of trading on June 15, 2020, to an intra-day low of $3.75 per share, representing a loss of nearly 15%, before closing at $3.85 per share at the end of trading on June 16 2020, representing a loss in value of nearly than 13%.

159.   Even after investors learned the truth regarding Genius's Kartoon Channel!, in contradiction to repeated statements made by the Individual Defendants leading up to the launch of Kartoon Channel!, the Company continued to market the Kartoon Channel! as "ad-supported" and **Fun, Family Friendly, and "FREE!!!"**, "FREE", or "Netflix for Kids, but Free" in its July 2020 Investor Presentation and press releases published on July 27, 2020, August 10, 2020, and August 13, 2020.

### June 16 Press Release

160.   On June 16, 2020, the Company circulated a press release (the "June 16 Press Release") announcing the new programming slate of content for Kartoon Channel!, in which Defendant Heyward stated, in relevant part:

> "'*Kartoon Channel*!,' our 24-hour, free, video on demand, children's program service went live this morning with unprecedented distribution reach, and an unprecedented initial content lineup."
> "Kids and their parents want uplifting stories.  They want positive messages," added Heyward. "**It is also important to us that *Kartoon Channel!* is *free and available to everyone***. It is no less important that the stories are positive and with enriching lessons, whenever possible."
>
> …
>
> Defendant Loesch further stated, in relevant part, that "Having produced and broadcast thousands of children's episodes across a number of the kids networks, we wanted to make *Kartoon Channel!* stand out as a brand, **not just because it is free and available to everyone**,  but by putting on shows, which tell *positive stories.*  That is very very important to us."

(Emphasis added in bold, not italics.)

### June 18 Blog Post

161.   On June 18, 2020, the Company disseminated a Blog post (the "June 18 Blog Post") announcing that John Landis was joining the production team along with Arnold Schwarzenegger, in which Defendant Heyward stated, in relevant part:

> *I want all Genius Brands shareholders to understand the significance of this event.*
>
> It would be hard to overstate the importance of a director of John Landis' stature, joining this team to make this program, and the impact we expect to the success of the program, the channel, and *ultimately to Genius Brands revenues and valuation*.
>
> * * *
>
> If there was ever a team of champions, that makes *highly profitable blockbuster entertainment*, this is it.
>
> * * *
>
> When we said, that Kartoon Channel! would be like a "Netflix for kids, [sic] but free", *__we meant it__*!

162.   In the blog post, Defendant Heyward also admitted that Rainbow Rangers, was not, in fact, airing 26 times per week as he previously stated in the Company's March 17 Press Release, stating the following:

> The fact is that [Rainbow Rangers] airings on Nick Jr. have been scaled back while we are currently producing new episodes, which is a standard industry practice known as "resting."

163.   Even after investors learned the truth regarding Genius's Kartoon Channel!, in contradiction to repeated statements made by the Individual Defendants leading up to the launch of Kartoon Channel!, the Company continued to market the Kartoon Channel! as "ad-supported" and "**Fun, Family Friendly, and "FREE!!!**", "FREE", or "Netflix for Kids, but Free" in its July 2020 Investor Presentation and press releases published on July 27, 2020, August 10, 2020, and August 13, 2020.

164.   The statements and omissions referenced in ¶¶ 153–156 and 160–162 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (2) Kartoon Channel! would be available to Amazon Prime members only as an add-on channel for an additional subscription fee; (3) Kartoon Channel! platform was not as robust of an offering as the Individual Defendants purported; (4) the commercial viability of the Company was overstated in light of the true accuracy of the Company's products and assets; and (5) the Company failed to maintain internal controls. Due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Fully Emerges**

#### *July 2 Press Release*

165.   On July 2, 2020, the Company announced that it would host a conference call on Monday July 6, 2020 to discuss an "exciting business development" through a press release titled "Genius Brands International Chairman & CEO, Andy Heyward, to Host Conference Call to Discuss Key Business Development."

#### *July 6 Press Release, Shareholders Letter, and Conference Call*

166.   According to a press release dated July 6, 2020, Genius opened an online portal where investors could listen to the conference call due to an "unprecedented interest" in the conference call and the "expected high volume of callers."

167.   However, on the Company's conference call with investors held on July 6, 2020, instead of announcing an "exciting" and "key business" development, Defendant Heyward merely announced the creation of a joint venture with POW! Entertainment, Stan Lee Universe, regarding the acquisition of a proprietary right in the intellectual property to the unreleased and untested works created by Stan Lee post-Marvel Entertainment.

168.   Defendant Heyward professed to investors, in relevant part:

*In all of Hollywood, there is no greater prize.* This is the Holy Grail. **STAN LEE UNIVERSE** is a *once in a lifetime* asset, drawn from over 100 original, heretofore unexploited properties, created by the most successful creator of intellectual property of our time. In my view, the potential value in this single asset, is greater than any IP anywhere in Hollywood.

169.   By way of press release titled "Genius Brands International Announces Transaction to Create "Stan Lee Universe," the Company also circulated a letter from Defendant Heyward to shareholders in which he reiterated the statements referenced above that he made during his remarks to investors on the conference call earlier that morning.

170.   On this news, the price of the Company's stock plummeted from $3.55 per share at the close of trading on July 2, 2020—the prior trading day—to an intra-day low of $2.58 per share, representing a drop in value of more than 27%, before closing at $2.66 per share at the end of trading on July 6 2020, representing a drop in value of more than 25% on a massive trading volume of approximately 170 million shares.

171.   After the markets closed on July 6, 2020, The Motley Fool published an article titled "Why Genius Brands Stock Plunged 25% Today"[8] reporting that the words Defendant Heyward used to describe the Company's announcement earlier that day were "grandiose statements" and "a little far-fetched, to  say the least."

172.   On July 7, 2020, The Motley Fool published an article titled "Genius Brands Isn't as Smart as It Thinks It Is" (the "July 7 Motley Fool Article"),[9] reporting that the announcement did not warrant the pre-announcement hype the Company created surrounding the news. The Motley Fool Article provided, in relevant part, "[w]hen you

---

[8]     https://www.fool.com/investing/2020/07/06/why-genius-brands-stock-plunged-25-today.aspx (last visited August 28, 2020).
[9]   https://www.fool.com/investing/2020/07/07/genius-brands-isnt-as-smart-as-it-thinks-it-is.aspx (last visited August 28, 2020).

take on the role of being your own hype machine, no one should be surprised when reality falls short of the promise."

173.   The July 7 Motley Fool Article continued, in relevant part:

"Shares of [Genius] … opened another 17% lower on Tuesday after failing to wow investors with a new content announcement that it had been touting since late last week."

The slide undoes the stock's 54% surge on Thursday (the final trading day of last week) that came after Genius scheduled a conference call for Monday morning this week to discuss what it pitched as an "exciting business development." It turned out to be "business development," but the market is arguing that the choice of "exciting" as an adjective wasn't exactly warranted.

## DAMAGES TO GENIUS

174.   As a direct and proximate result of the Individual Defendants' conduct, Genius has lost and expended, and will lose and expend, many millions of dollars.

175.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and its CEO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

176.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

177.   As a direct and proximate result of the Individual Defendants' conduct, Genius has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

178.   Plaintiff brings this action derivatively and for the benefit of Genius to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Genius, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

179.   Genius is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

180.   Plaintiff is, and has continuously been at all relevant times, a shareholder of Genius. Plaintiff will adequately and fairly represent the interests of Genius in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

181.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

182.   A pre-suit demand on the Board of Genius is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Heyward, Davis, Hallren, Klein, Loesch, Segall, and Thomopoulos (the "Director-Defendants"), along with non-party Karen McTier (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

183.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in insider sales based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

184.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

185.   Additional reasons that demand on Defendant Heyward is futile follow. Defendant Heyward is the founder of the Company and has served as the Company's Chairman of the Board and CEO since 2013. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Heyward with his principal occupation, and he receives handsome compensation, including $411,500 during fiscal year 2019. Defendant Heyward personally made and was ultimately responsible for all of the false and misleading statements and omissions that were made, including, but not limited to, those contained in the March 17 Press Release, March 20 Press Release, March 23 Press Release, March 31 Press Release, April 20 Press Release,  May 13 Press Release, May 13 Shareholder Letter, June 5 Press Release, June 5 Shareholder Letter, June 8 Press Release, June 12 Press Release, June 16 Press Release, and June 18 Blog Post, in the March 20 Conference Call and the April 20 Conference Call, and in the Company's recent filings with the SEC, including, but not limited to, the March 24 Offering Documents, May 7 Offering Documents, May 11 Offering Documents, May 19 Offering Documents, and the May 29 Offering Documents, June 11 Form 424B3, in the 2019 10K, which he signed and signed SOX certifications for, and the 1Q20 10-Q, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his

duties to protect corporate assets. His insider sale before the fraud was exposed, which yielded approximately $1.3 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Heyward is a defendant in the Securities Class Action. For these reasons, too, Defendant Heyward breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186. Additional reasons that demand on Defendant Davis is futile follow. Defendant Davis has served as a Company director since December 2013, and also serves as a member of the Nominating Committee. Defendant Davis has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Davis signed, and thus personally made, the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Davis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187. Additional reasons that demand on Defendant Hallren is futile follow. Defendant Hallren has served as a Company director since August 2013, and also serves as Chair of the Audit Committee and as a member of the Compensation Committee and Nominating Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded him duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded him duties to protect corporate assets. Defendant Hallren also signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons too, Defendant Hallren breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188. Additional reasons that demand on Defendant Klein is futile follow. Defendant Klein has served as a Company director since March 2019, and also serves as a member of the Audit Committee and the Nominating Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Klein also signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons too, Defendant Klein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189. Additional reasons that demand on Defendant Loesch is futile follow. Defendant Loesch has served as a Company director since March 2015 and as Executive Chairman of Kartoon Channel! since June 5, 2020. Defendant Loesch has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Loesch also signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons too, Defendant Loesch breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

190. Additional reasons that demand on Defendant Segall is futile follow. Defendant Segall has served as a Company director since December 2013, and also serves

as the Chair of the Nominating Committee. Defendant Segall has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Segall also signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons too, Defendant Segall breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

191.   Additional reasons that demand on Defendant Thomopoulos is futile follow. Defendant Thomopoulos has served as a Company director since December 2013, and also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Thomopoulos also signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons too, Defendant Thomopoulos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192.   Additional reasons that demand on the Board is futile follow.

193.   As described above, one of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendant Heyward received proceeds of over $1.3 million as a result of an insider transaction executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and thus excused.

194.    The   Director-Defendants   have   longstanding   business   and   personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Heyward is the co-founder and served as the CEO of DIC Animation City until its sale to Capital Cities/ABC, Inc., where Defendant Davis had served as a member director. Moreover, six of the seven Directors has served on the Board for five years or more. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

195.    Defendants Hallren, Klein, and Thomopoulos (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, compliance with legal and regulatory requirements, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

196.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct,

the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

197.   Genius has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Genius any part of the damages Genius suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

198.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

199.   The acts complained of herein constitute violations of fiduciary duties owed by Genius's officers and directors, and these acts are incapable of ratification.

200.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Genius. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Genius, there would be no directors' and officers' insurance protection. Accordingly, the

Verified Shareholder Derivative Complaint

Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

201.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Genius to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

202.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of**
**Section 14(a) of the Exchange Act**

203.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

205.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in

contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

206.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

207.   Under the direction and watch of the Directors, the 2020 Proxy Statement failed to disclose, *inter alia*, that: (1) Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (2) Kartoon Channel! would be available to Amazon Prime members only as an add-on channel for an additional subscription fee; (3) Kartoon Channel! platform was not as robust of an offering as the Individual Defendants purported; (4) the commercial viability of the Company was overstated in light of the true accuracy of the Company's products and assets; and (5) the Company failed to maintain internal controls. Due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

208.   The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

209.   Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

210.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including, but not limited to, election of directors, approval of the Issuance Proposal 1, approval of the Issuance Proposal 2, approval of the Amendment Proposal, ratification of the Company's independent auditor, and advisory approval of executive compensation.

211.   The false and misleading elements of the 2020 Proxy Statement led to the approval of Issuance Proposals 1 and 2, rejection of the Amendment Proposal, and to the re-election of Defendants Heyward, Davis, Hallren, Klein, Loesch, Segall, and Thomopoulos, which allowed them to continue breaching their fiduciary duties to Genius.

212.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020 Proxy Statement.

213.   Plaintiff on behalf of Genius has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

214.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Genius's business and affairs.

216.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

217.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Genius.

218.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

219.   In further breach of their fiduciary duties owed to Genius, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (2) Kartoon Channel! would be available to Amazon Prime members only as an add-on channel for an additional subscription fee; (3) Kartoon Channel! platform was not as robust of an offering as the Individual Defendants purported; (4) the commercial viability of the Company was overstated in light of the true accuracy of the Company's products and assets; and (5) the Company failed to maintain internal controls. Due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

220.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

221.   In breach of his fiduciary duties, one of the Individual Defendants made a lucrative insider sale while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

222.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

223.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

224.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

225.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Genius has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

226.   Plaintiff on behalf of Genius has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

227.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Genius.

229.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Genius that was tied to the performance or artificially inflated valuation of Genius, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

230.   Plaintiff, as a shareholder and representative of Genius, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

231.   Plaintiff on behalf of Genius has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

232.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

234.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

235.   Plaintiff on behalf of Genius has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Genius, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Genius;

(c)   Determining and awarding to Genius the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Genius and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Genius and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Genius to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

1

2

       (e)     Awarding Genius restitution from the Individual Defendants, and each
of them;

3

4

       (f)     Awarding Plaintiff the costs and disbursements of this action, including
reasonable attorneys' and experts' fees, costs, and expenses; and

5

6

       (g)     Granting such other and further relief as the Court may deem just and
proper.

7

## **<u>JURY TRIAL DEMANDED</u>**

8

9

Plaintiff hereby demands a trial by jury.

10

11

   Dated: September_9, 2020         Respectfully submitted,

12

                         **THE BROWN LAW FIRM, P.C.**

13

                         *s/Robert C. Moest*

14

                         Robert C. Moest, Of Counsel, SBN 62166
                         2530 Wilshire Boulevard, Second Floor

15

                         Santa Monica, California 90403

16

                         Telephone: (310) 915-6628
                         Facsimile: (310) 915-9897

17

                         Email: RMoest@aol.com

18

19

                         **THE BROWN LAW FIRM, P.C.**
                         Timothy Brown

20

                         240 Townsend Square
                         Oyster Bay, NY 11771

21

                         Telephone: (516) 922-5427

22

                         Facsimile: (516) 344-6204
                         Email: tbrown@thebrownlawfirm.net

23

24

                         *Counsel for Plaintiff*

25

26

27

28

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Eduardo Correa am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

9/9/2020

DocuSigned by:

*Eduardo Correa Flores*

FC6378550C96443...

Eduardo Correa